**Houston L. MELVIN, Plaintiff,**

v.

**Melvin R. LAIRD, as Secretary of Defense, Department of Defense, Robert F. Froehlke, as Secretary of the Army, Department of the Army, Defendants.**

No. 71–C–1533.

United States District Court,
E. D. New York.

Oct. 12, 1973.

512

---

W. Dennis Cross, New York City, for plaintiff; Vincent A. Moccio, New York City, of counsel.

Robert A. Morse, U. S. Atty., E. D. N. Y., Brooklyn, N. Y., for defendants; George H. Weller, Asst. U. S. Atty., of counsel.

## MEMORANDUM AND ORDER

WEINSTEIN, District Judge.

Plaintiff, a former captain, asserts that his 1954 conviction by general court-martial on charges of larceny in Japan was obtained through the deprivation of several of his constitutional rights. He seeks declaratory and injunctive relief. Specifically, he claims he was denied (1) his right to be present, to be represented by counsel, to cross-examine witnesses and to call witnesses of his own at the pretrial investigation conducted pursuant to Article 32 of the Uniform Code of Military Justice ("UCMJ"), 10 U.S.C. § 832; (2) the opportunity during his trial to confront the executive officer of his unit whose testimony plaintiff claims was vital to his case; and (3) the effective assistance of counsel by the failure of his assigned military counsel to conduct an adequate pretrial investigation, to present necessary witnesses and documentary evidence, or to argue at the close of the case.

Appearing pro se, plaintiff requested that the court appoint an attorney to represent him because he could not afford one. Through the office of the Council of New York Law Associates, W. Dennis Cross, Esq., volunteered his services. Mr. Cross and associate counsel, Vincent A. Moccio, Esq., as well as counsel for the government have conducted the litigation with great skill.

Plaintiff has moved for summary judgment on his affidavit, the transcript of the court-martial proceedings, and extensive military records. Defendants have moved (1) to dismiss the complaint on the ground that the Court of Claims has exclusive jurisdiction, and (2) for summary judgment on the merits.

Upon oral argument it was stipulated that, if judgment was not granted on the motions, the court could try the case on the record as supplemented by other material counsel might wish to present. Defendant did supplement the record by an affidavit of Melville C. Wilson, Jr.,

dated May 26, 1973. Mr. Wilson had acted as defense counsel at the court-martial. Independent inquiry of the court revealed that Mr. Wilson had been admitted to the bar in South Carolina in 1951.

For the reasons indicated below: (1) this court has jurisdiction; (2) summary judgment for defendant does lie; and (3) if summary judgment is inappropriate, the complaint must be dismissed for failure of proof.

## I. FACTS

Enlisted in the Army as a private in April of 1943, plaintiff rose through the ranks to sergeant. He participated in the 1944 invasion of France, and in May of 1945 was awarded a field commission as a second lieutenant. While he was a rifle company commander during the Korean War, he was captured and escaped with three enlisted men, killing two Chinese guards. He was wounded in combat four times during his Army service, for which he received the purple heart with three clusters. As a result of one of his wounds by mortar fire when he was knocked unconscious, he was hospitalized for months, receiving psychiatric treatment for anxiety reaction and "temporary insanity." He was also awarded theater ribbons for the European and Philippines operations in World War II, for the Korean War and for the occupation of Japan, the Army Commendation Medal, the Good Conduct Medal, the American Theater of Operations Ribbon, the Combat Infantry Badge and the Parachutist's Badge. His record includes seven letters of appreciation and commendation for outstanding service.

By 1954, plaintiff had reached the rank of captain. He was ordered to Japan to assume the duties of officer in charge of the Supply Division of the Transportation Section, Camp Tokyo. It was the first time he had been assigned to supply duties and he was generally unfamiliar with Army supply procedures.

When he assumed his new duties his unit was in the throes of last minute preparations for two important inspections scheduled to take place within the following month. A physical inventory of the Supply Division, the first in two years, was underway under the active supervision of Lieutenant Colonel Charlie W. Johnson, Jr., the executive officer, who had held the job of supply officer about 18 months earlier.

Almost immediately, plaintiff claimed, he discovered that the supply of Class X clothing—clothing that was no longer fit for military purposes—was in excess of the amount authorized. When he brought that fact to Lieutenant Colonel Johnson's attention, Johnson, according to plaintiff, told him to remove the clothing from the warehouse until after the inspection. According to his allegations, plaintiff arranged for the rental of storage space in civilian quarters until after the inspection, at which time he intended to retrieve the clothing for future use to outfit civilian drivers. He transported the clothing to the new location in government vehicles.

The testimony at the court-martial, however, also supported a contrary interpretation. It indicated that plaintiff was short of money due to gambling and that he arranged to sell Army uniforms to Japanese civilians and to deliver them with Army trucks, receiving substantial amounts of yen in exchange. Details of the transactions might, depending upon point of view, be interpreted as surreptitious and indicative of criminal intent or open and naive, reflecting an attempt to save American taxpayer's money and cut red tape.

Following an investigation by the Provost Marshal Investigative Division, Major James W. Moore informed plaintiff that he had been appointed to conduct a pretrial investigation as required by Article 32 of the UCMJ, 10 U.S.C. § 832. Psychiatric examinations indicated some mental problems but none sufficient to prevent a trial or to suggest insanity as a defense. Plaintiff's tendered resignation to avoid trial was refused. Some time thereafter, plaintiff was told that the pretrial investigation had been completed and the results forwarded to the convening authority with a recommendation that a general court-martial be convened. Plaintiff only then determined, according to his allegations, that he needed counsel.

Civilian counsel, M. A. Braun, was retained. Plaintiff had two or three conferences with Mr. Braun of short duration during which the only matters discussed were general questions of court-martial procedure and an offer from the Trial Judge Advocate's office for a one year sentence in return for a guilty plea, an offer which was declined.

Several days after retaining civilian counsel, plaintiff met Captain Melville C. Wilson for the first time. Captain Wilson visited plaintiff in his quarters and, according to plaintiff, advised him to dismiss his civilian counsel on the ground that the retention of a non-military lawyer might be considered "disloyal". Plaintiff dismissed his civilian counsel by a letter dated August 31, 1954, drafted by Captain Wilson.

Plaintiff states that at no time prior to or during the Article 32 investigation was he advised of his right to be present, to be represented by counsel, to cross-examine witnesses or to call witnesses in his behalf. Defendants dispute this, relying on the detailed recitations in the Article 32 report, indicating which witnesses were examined in defendant's presence and in which instances he waived the right to be present and the affidavit of Major Moore that, although he has no independent recollection, the report he prepared is correct. The affidavit of Melville C. Wilson was very specific. He swears that "Captain Melvin was physically present at the Article 32 investigation." He says he is positive of this because it was his invariable practice, because the case, involving as it did an of-

ficer, was so unusual, and because of the frequent discussions he had with the accused.

According to plaintiff, he had only two conferences with Captain Wilson before the trial. Other than these conferences and review of the investigative reports, Captain Wilson, according to plaintiff, made no further preparation; specifically, it is claimed that his counsel declined to interview Lieutenant Colonel Johnson or any other potential witness, or to examine records suggested by plaintiff as supporting his version of the events. Lieutenant Colonel Johnson was never called as a witness.

The claims as to lack of preparation are denied by Mr. Wilson under oath; his affidavit speaks of being billeted in the same building with plaintiff and meeting plaintiff on numerous occasions when the case was discussed. A reading of the record of the trial shows a detailed cross-examination of the twenty prosecution witnesses and one court witness and a good grasp of the facts in the direct examination of the seven defense witnesses, including plaintiff. With the trial itself taking four days and the introduction of many documents by both sides, preparation before and during trial must have been extensive. This is particularly true since both plaintiff and his counsel attended, the court finds, examination of witnesses in the Article 32 investigation.

Following conviction, plaintiff was sentenced to dismissal (equivalent to a dishonorable discharge), forfeiture of all pay and allowances, and confinement to hard labor for five years. A full appeal before the Army's Board of Review was heard, plaintiff being represented by a civilian attorney; the findings and sentence were affirmed. A petition—prepared by civilian counsel—for review by the Court of Military Appeals was denied. Also denied was a petition to the Army's Judge Advocate General for a new trial. The term of confinement was subsequently reduced to three years by the Assistant Secretary of the Army.

After 18 months confinement plaintiff was paroled.

In 1968, plaintiff applied to the Army Board for the Correction of Military Records for correction of his record to show that his court-martial was illegally conducted and the conviction that resulted was a nullity; he requested a hearing. All relief was denied by the Board.

Plaintiff commenced this action in November of 1971, seeking a determination that his conviction was obtained in violation of his rights and should be set aside. There have been excusable delays in obtaining records and the deposition of Mr. Wilson. No contention is made that plaintiff has not exhausted his administrative remedies.

## II. JURISDICTION

■ As defendants acknowledge, persuasive authority supports the proposition that the courts will not shut the judicial door on one who alleges he has been deprived of a constitutional right by the military justice system. *See, e. g.,* Homcy v. Resor, 147 U.S.App.D.C. 277, 455 F.2d 1345 (1971) (improper command pressure World War II); Ragoni v. United States, 424 F.2d 261 (3d Cir. 1970) (mandamus jurisdiction based on claim of mental incompetence; relief denied on merits); Kauffman v. Secretary of the Air Force, 135 U.S. App.D.C. 1, 415 F.2d 991 (1969), *cert. denied,* 396 U.S. 1013, 90 S.Ct. 572, 24 L.Ed.2d 505, *reh. denied,* 397 U.S. 1031, 90 S.Ct. 1255, 25 L.Ed.2d 546 (1970) (habeas corpus jurisdiction over plaintiff not in custody; claim of illegally obtained evidence denied on merits); Smith v. McNamara, 395 F.2d 896 (10th Cir. 1968) *cert. denied,* 394 U.S. 934, 89 S.Ct. 1211, 22 L.Ed.2d 466, reh. denied, 394 U.S. 995, 89 S.Ct. 1477, 22 L.Ed.2d 773 (1969) (mandamus jurisdiction; claim of lack of counsel denied on merits); Ashe v. McNamara, 355 F.2d 277 (1st Cir. 1965) (mandamus jurisdiction; lack of counsel). Utilizing, as appropriate, the remedies of habeas, mandamus, declaratory judgment, and awards of

back pay, injustices will, to the extent possible, be corrected. *See, e. g.,* Judicial Review of Military Action with respect to Type of Discharge Given Servicemen, 4 A.L.R. Fed. 343 (1970); Slattery, Federal Court Review of Decisions of Military Tribunals, 40 U.Cin.L.Rev. 569 (1971); Weckstein, Federal Court Review of Court Martial Proceedings: A Delicate Balance of Individual Rights and Military Responsibilities, 54 Mil.L. Rev. 1 (1971); Note, Civilian Review of Military Courts-Martial, 1971 U.Ill.L.F. 124; Note, Civilian Court Review of Court Martial Adjudications, 69 Col.L. Rev. 1259 (1969).

Since Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), the federal courts have exercised habeas corpus jurisdiction over federal court convictions involving violation of constitutional rights not constituting a jurisdictional defect—there denial of counsel was alleged. In Burns v. Wilson, 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953), a like jurisdiction was extended to convictions by court-martial. Mandamus was held to be an appropriate remedy in the case of a former serviceman, not in custody, who challenged a less than honorable discharge, in Harmon v. Brucker, 355 U.S. 579, 78 S.Ct. 433, 2 L.Ed.2d 503 (1958).

■ Jurisdiction of federal courts to review courts-martial for constitutional defects is generally coextensive with their habeas corpus jurisdiction in civilian cases. The scope of federal court review of courts-martial is not limited, as some originally thought, to the technical elements of jurisdiction or to a mere inquiry into whether the plaintiff received a "full and fair" hearing from the military court, but extends to all errors of constitutional dimension. *See, e. g.,* Kauffman v. Secretary of the Air Force, 135 U.S.App.D.C. 277, 415 F.2d 991 (1969), *cert. denied,* 396 U.S. 1013, 90 S.Ct. 572, 24 L.Ed.2d 505, *reh. denied,* 397 U.S. 1031, 90 S.Ct. 1255, 25 L. Ed.2d 546 (1970).

There are a number of routes that may be followed in obtaining collateral review of court-martial convictions in civilian courts. For a serviceman no longer in custody, the primary alternatives are (1) an action in a federal district court for mandamus or declaratory judgment, and (2) a suit in the Court of Claims for back pay. Where a district court has found the plaintiff's claims meritorious, the result has typically been a holding that the court-martial sentence was a nullity and that necessary action should be taken to remove the disabilities that flow from that sentence. Sometimes this takes the form of a mandatory injunction directed to the Secretary. *See, e. g.,* Ashe v. McNamara, 355 F.2d 277 (1st Cir. 1965). At other times a declaratory judgment and remand to the Department for appropriate action is utilized. *See, e. g.,* Homcy v. Resor, 147 U.S.App.D.C. 277, 455 F.2d 1345 (1971).

■ Notwithstanding these authorities, defendants urge that, because a judgment favorable to plaintiff here may give rise to substantial monetary liability—well in excess of $10,000—against the United States for back pay, this court is ousted of subject matter jurisdiction. The superficial appeal of this position arises from the fact that while the Court of Claims can grant both monetary and other relief, the district courts do not have jurisdiction to render money judgments in excess of $10,000. 28 U.S.C. §§ 1346(b), 1491, *cf.* 28 U.S.C. § 1361. The position does not withstand analysis.

■ Development of the powers of the district courts and the Court of Claims to provide particular kinds of relief has been characterized by a gradually expanding area of concurrent jurisdiction. Prior to the 1964 passage of the Tucker Act, 28 U.S.C. § 1346, there appears to have been no overlap at all. Subsequently the power, first of the district courts to award money judgments and then of the Court of Claims to issue non-monetary orders, has been expanded, so that today both courts have the power to issue both monetary and non-monetary judgments, where appropriate.

The history and statutory language of these developments discloses not the slightest indication that Congress intended, in expanding the powers of one of these tribunals, to reduce those of the other; the evidence is strongly to the contrary.

Before 1964, the respective jurisdiction of the district courts and the Court of Claims were entirely separate in terms of the relief they could grant, so that it was necessary for a litigant who sought both a declaratory judgment and back pay to go to both courts. The Tucker Act partly rectified this situation, granting power to the district courts to render money judgments against the United States for amounts not exceeding $10,000. Chief Judge Wilson Cowen of the Court of Claims was later to note:

> Wholly apart from their Tucker Act jurisdiction, the United States District Courts have for years exercised jurisdiction over suits brought by illegally discharged Government employees for restoration to their former positions.
>
> Until 1964, however, the District Courts did not have the authority to award the affected employee back pay for the period of his illegal discharge. On August 30, 1964, Congress enacted Public Law 88–519 which empowered the District Courts to render judgment on the claims of such employees for back pay.
>
> The declared purpose of that act was to enable the employee to obtain all necessary relief in one action and to eliminate the necessity of filing another suit in the Court of Claims for back pay.
>
> Hearings before Subcommittee No. 2 of the Committee on the Judiciary, House of Representatives, on H.R. 12392, March 1, 1972, pp. 12–13.

Although it expanded the arsenal of remedies available in the district courts, the 1964 Act in no way contracted the jurisdiction of the Court of Claims. The Court retained, *in toto*, its powers to award money judgments. In a suit founded on a wrongful dismissal from governmental service, a claim that (as a result of the 1964 Act) the Court of Claims could not render a money judgment for claims of less than $10,000 would have been rejected out of hand. As Chief Judge Cowen's statement clearly indicates, the purpose of the 1964 Act was to facilitate actions in the district courts, but in no way to contract the jurisdiction of the Court of Claims.

From 1964 through 1972 the relevant statutory provisions were the following:

28 U.S.C. § 1491:

> The Court of Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department . . . .

28 U.S.C. § 1346(a):

> The district courts shall have original jurisdiction, concurrent with the Court of Claims, of: . . .
>
> (2) Any other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department. . . .

As to claims in excess of $10,000, therefore, it was still necessary for any claimant to seek monetary relief in the Court of Claims and to go to the district court for any non-monetary relief he might require. That the Court of Claims lacked the competence to grant non-monetary relief as an incident to its monetary awards was confirmed by the 1969 Supreme Court opinion in United States v. King, 395 U.S. 1, 89 S.Ct. 1501, 23 L. Ed.2d 52 reversing a Court of Claims ruling that that Court was empowered to grant declaratory relief. King v. United States, 390 F.2d 894, 182 Ct.Cl. 631 (1968).

Congress responded in 1972 when Section 1491 of Title 28 was amended to extend the Court of Claims jurisdiction so

that in cases where monetary relief was properly requested the Court, incident to its power to grant a money judgment, could also grant injunctive and declaratory relief. The amendment added the following language:

> To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records, and such orders may be issued to any appropriate official of the United States. In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just.

The amendment was "applicable to all judicial proceedings pending on or instituted after the date of its enactment," on August 29, 1972. P.L. 92–415 (1972). We put aside the issue of whether, even if it were intended to oust this court of jurisdiction in the future, the statute was designed to cancel jurisdiction in a case already commenced in a district court—the situation before us.

The legislative history of the 1972 amendment makes manifest that the motivation for its enactment was a Congressional desire to respond to the need of the Court of Claims to implement its monetary judgments with collateral equitable relief, so that litigants, *if they so desired,* would be able to obtain complete relief in the Court of Claims. The legislative background, however, leaves little doubt that the added powers of the Court of Claims to grant incidental relief were in no way intended to oust the jurisdiction of the district courts to act pursuant to its mandamus and declaratory judgment powers. *See* U.S.Code Congressional and Administrative News, 92nd Congress, Second Session, 749, 3116, 5658 (1972); S.Rept. No. 92–1066, 92nd Cong., 2d Sess. 2 (1972); H.Rept.

No. 92–1023, 92nd Cong., 2d Sess. 2 (1972); Hearings before Subcommittee No. 2 of the Committee on the Judiciary, House of Representatives, on H.R. 12392, March 1, 1972; Congressional Record, May 1, 1972, H. 3769.

The bulk of the legislative history of H.R. 12392 is contained in the Hearings before the House Committee on the Judiciary, Subcommittee number 2, held on March 1, 1972. These hearings demonstrate the concern of Congress about the effect of the Supreme Court's decision in *King* upon the power of the Court of Claims to issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records.

The House Report on H.R. 12392 underlines this primary concern impelling passage of the Amendment:

> One of the primary purposes of this legislation is to enable the Court of Claims to provide for restoration to or placement in appropriate duty or retirement status as an "incident of and collateral to" the money judgments it now renders in civilian and military pay cases. As was observed by the witness appearing in behalf of the Department of Justice at a hearing on this bill on March 1, 1972, as a practical matter this type of collateral relief generally follows the entry of a money judgment since the agency involved can provide such relief by administrative action. However, should such action be refused, the unsuccessful plaintiff in the Court of Claims must institute a second proceeding in a United States District Court for restoration.

House Report No. 92–1023, pages 2–3.

The Senate Report is equally explicit in laying out the purpose of the enactment:

> The purpose of H.R. 12392 is to allow persons having monetary claims falling within the jurisdiction of the Court of Claims to obtain all necessary relief in one action.

The bill does not extend the class of cases over which the Court of Claims has jurisdiction . . . . The bill would provide an entire remedy which would complete the relief afforded by the judgment as an incident of and collateral to any judgment it may now render . . . .

. . . The power of the Court of Claims has been limited in the past to rendering money judgments. The interpretation of section 1491, title 28, United States Code, has excluded any collateral remedy even though a number of classes of cases, composing a substantial portion of the Court of Claims docket, are subject to the need for collateral remedies in addition to a *money judgment.*

Senate Report No. 92–1066, 2 U.S. Code Congressional and Administrative News 3116, 3117 (1972).

In suggesting that district court jurisdiction is ousted in these circumstances, defendants ignore the manifest legislative intent that H.R. 12392 not enlarge the jurisdiction of the Court of Claims; the new equitable relief was meant to be collateral only. Our system of federal courts, fortunately, requires no such circuitous route to relief as suggested by defendants: a litigant is not required to resort to claiming monetary relief from the Court of Claims solely for purposes of appending a non-monetary claim which constituted the relief the party was really seeking to begin with.

Claims of serious constitutional deprivations have been alleged in this cause. Only in the face of the clearest of Congressional intentions could the powers of this court to come to grips with claims of such dimension be ousted by the availability of *monetary relief from* the Court of Claims.

In only two of the many cases cited by defendants was district court jurisdiction declined on the ground that the Court of Claims should determine the issue. Carter v. Seamans, 411 F.2d 767 (5th Cir. 1969), *cert. denied,* 397 U.S. 941, 90 S.Ct. 953, 25 L.Ed.2d 121

(1970); Parrish v. Seamans, 343 F. Supp. 1087 (D.S.C.1972).

*Carter* v. *Seamans* was an action for a declaratory judgment that the plaintiff's discharge "under other than honorable conditions" was illegal and that he had continued to hold his commission and to be promoted at regular intervals, and for an injunction prohibiting the defendant from withholding all pay and allowances, estimated at $135,000. An action by the same plaintiff, based on the same allegations, was pending in the Court of Claims, and had been stayed pending disposition of the case in the district court. Noting that the relief sought included a substantial claim for pay and allowances, the district court concluded that *"the claim for back pay and allowances constitutes the keystone of this entire lawsuit",* (emphasis added) and that the action "in substance . . . is [for] a money judgment against the United States for back pay in excess of $10,000." 411 F.2d at 771. Under 28 U.S.C. § 1346(a)(2), the court found that it did not have jurisdiction to make such a monetary award. It further held that, while it had mandamus jurisdiction under 28 U.S.C. § 1361, it would decline to exercise that jurisdiction in view of its finding that the action was essentially one for a money judgment that it could not grant. The Fifth Circuit affirmed in a short *per curiam* opinion, finding "no abuse of the district court's discretion" in deferring to the Court of Claims. 411 F.2d at 769. (The district court opinion is unreported, but is printed as an appendix to the Fifth Circuit opinion.)

Similarly, the plaintiff in *Parrish* v. *Seamans,* sought a judgment declaring his court-martial conviction void and restoring his rank, pay, allowances and other benefits. The Board for Correction of Military Records had already corrected his records to show that he had received an honorable discharge. The court found that, particularly in view of the fact that his records had already been corrected, "the crux of plaintiff's claim is monetary," and that the other relief

requested was "only incidental to his monetary claim." 343 F.Supp. at 1093, 1094. Assuming it had jurisdiction, the court declined to exercise it and followed *Carter* in deferring to the Court of Claims. 343 F.Supp. at 1094.

In both *Carter* and *Parrish*, there was substantial support for the court's conclusion that the monetary relief was at the heart of the plaintiff's claim. Here, in contrast, plaintiff does not seek monetary relief at all. He seeks only collateral review of his conviction by this court, based upon his claim that he was deprived of his constitutional rights to confront his accusers and to effective assistance of counsel. Plaintiff may seek back pay at a later date; but whether he does or not, and whatever amount he may seek, this court's jurisdiction to determine the issues now before it is not affected.

Defendants' contention might have more validity if the relief requested by plaintiff had no value apart from the potential back pay to be realized from a subsequent suit in the Court of Claims. That the continuing disabilities of such a conviction are of substantial import was noted eloquently by Senior Circuit Judge Edgerton in *Kauffman, supra*:

> [T]he deprivation of liberty under an invalid conviction is a grievous injury, but a military discharge under other than honorable conditions imposes a life-long disability of greater consequence for persons unlawfully convicted by courts martial. "In terms of its effects on reputation, the stigma experienced by the recipient of a discharge under other than honorable conditions is very akin to the concept of infamy . . . ." Everett, Military Administrative Discharges— The Pendulum Swings, 1966 Duke L.J. 41, 50.

415 F.2d at 995. *Cf.* Carafas v. LaValle, 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968) (habeas corpus over state defendant who had been released).

■ It would be demeaning to justice and to respect for the non-monetary concerns of former officers, for this court to hold that plaintiff's claims for invalidity of his conviction and discharge are necessarily masks for a subsequent claim of monetary relief. At least as important as back pay are "a man's career, his livelihood, his rights as a veteran, his status as a convicted criminal, and his reputation." Augenblick v. United States, 377 F.2d 586, 592, 180 Ct.Cl. 131, 142 (1967), *rev'd on other grounds*, 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969). The non-monetary claims which comprise plaintiff's allegations are substantial and clearly susceptible to relief from this court.

■ This court has power to act upon plaintiff's claim under Sections 1331 and 2201 of Title 28 of the United States Code, as well as pursuant to its general habeas corpus jurisdiction. *See* 28 U.S.C. § 2241; Kauffman v. Secretary of the Air Force, *supra*. *Cf.* Carafas v. LaValle, 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968); Cortright v. Resor, 325 F.Supp. 797 (S.D.N.Y.), *rev'd on other grounds*, 447 F.2d 245 (2d Cir. 1971) (amount in controversy under § 1331). It is necessary, therefore, only to comment briefly on defendant's challenge to this court's power to proceed in this cause pursuant to its mandamus jurisdiction under section 1361. Defendants' basic position is that this court should not exercise its mandamus powers because of the availability of an "adequate" alternative remedy, that is, a money judgment in the Court of Claims with ancillary equitable relief tagged on. But as we have noted above, it was clearly not the intent of Congress in enacting the amended section 1491 to require litigants, rightfully before the district courts, to instead frame demands for monetary relief before the

Court of Claims in order to obtain the non-monetary relief they originally wished to seek in the district courts.

## III. THE RIGHT TO CONFRONTATION

Plaintiff claims a denial of his right to confront his accusers at two separate stages of his conviction. Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed. 2d 923 (1965); United States v. Clay, 1 C.M.R. 74 (U.S.C.M.A. 1951). First, although he clearly had the right to be present at the Article 32 pretrial investigation (e. g., United States v. Nichols, 8 U.S.C.M.A. 119, 23 C.M.R. 343 (1957)), he claims he was not present, either personally or, so far as he is aware, through counsel. As already noted there is no factual basis for this contention.

█ Second, plaintiff points to the absence at his trial of Lieutenant Colonel Johnson, the officer who initiated the investigation, filed the charges against the plaintiff, and had knowledge of relevant exculpatory facts. The fact that Johnson signed the charges is of no more significance than the fact that an indictment is signed by the foreman or United States Attorney. Charges do not constitute testimony and there is no need to confront the person who signed the charges.

█ So far as failure of defense counsel to call Johnson is concerned, this was a tactical decision. It allowed the plaintiff to testify favorably to himself with respect to oral orders he had received from his commanding officer and permitted him to raise a serious factual issue of justification for his actions. On the basis of the record there is little doubt that, had Johnson been called, he would have contradicted the plaintiff, making a conviction even more likely than it already was. Counsel for the plaintiff was well advised not to seek to have this witness produced.

## IV. EFFECTIVE ASSISTANCE OF COUNSEL

█ Plaintiff claims that he was denied effective assistance of counsel because Captain Wilson's representation, once it began, failed to meet the minimum standards of effectiveness. The facts simply do not support this contention. The court is satisfied, having read the extensive court-martial record, that defense counsel handled the case with far more skill than was required to meet minimum constitutional standards. See, e. g., United States ex rel. Cooper v. Reincke, 333 F.2d 608 (2d Cir.), cert. denied, 379 U.S. 909, 85 S.Ct. 205, 13 L. Ed.2d 181 (1964).

Claims of grossly inadequate preparation for trial in failure to conduct any independent investigation of the facts, even to the point of failing to interview a single witness, and ignoring plaintiff's specific requests to obtain exculpatory testimony and documentary evidence are belied by the record. Failure to insist on the presence at trial of Lieutenant Colonel Johnson has already been discussed and found to have constituted sound legal tactics.

█ It is urged that although there was sufficient evidence in the record to support an argument to the court that would have raised substantial doubt as to plaintiff's guilt, Captain Wilson, made no closing argument. But neither, the record shows, did counsel for the prosecution make any argument. The charge of the law officer laid full stress on the need of the prosecution to prove each element of the offense beyond a reasonable doubt and protected plaintiff. Had defense counsel sought to sum up, undoubtedly the prosecution would have countered his arguments. Such an exchange of arguments, assuming neither counsel was much superior to the other, could only, by dwelling on the details of the evidence, have hurt plaintiff. Cf. Johns v. Smyth, 176 F.Supp. 949 (E.D. Va.1959) (attorney's conscience prevent-

ed argument; normally failure to argue is a matter of trial tactics).

Plaintiff did have counsel in a "substantial sense". Powell v. Alabama, 287 U.S. 45, 58, 53 S.Ct. 55, 60, 77 L.Ed. 158 (1932). Effective counsel means "not errorless counsel, and not counsel judged ineffective by hindsight, but counsel reasonably likely to render *and rendering* reasonably effective assistance." MacKenna v. Ellis, 280 F.2d 592, 599 (5th Cir. 1960) (emphasis in original).

From the point at the beginning of the trial when he challenged a member of the court to the submission of intelligent requests to charge, defense counsel acted skillfully. Had plaintiff accepted his counsel's "advice" not to testify he might even have been acquitted, for the cross-examination of plaintiff was devastating. We cannot even twenty years later and 6,000 miles away, say with assurance how defense counsel might have better handled this sad and difficult case.

## V. CONCLUSION

■ There are suggestions in the record that plaintiff, a black officer, was not treated by his white commanding officer with the understanding afforded other officers, that his acts were in part explicable by personal problems and his severely unsettling experiences under difficult battle conditions, and that, in view of his fine record, he was harshly treated. These reasons would warrant administrative or executive intervention. See 28 C.F.R. § 0.35; 29 C.F.R. Part 26. They do not rise to the level of constitutional errors warranting action by a district court setting aside a conviction. Burns v. Wilson, 346 U.S. 137, 142, 73 S.Ct. 1045, 1049, 97 L.Ed. 1508 (1953).

The complaint is dismissed. Plaintiff was convicted after a "disciplined contest," fairly conducted. United States v. Augenblick, 393 U.S. 348, 356, 89 S.Ct. 528, 534, 21 L.Ed.2d 537 (1969).

So ordered.